# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**vs.**                                **No. CR 15-619 MCA**

**REY ALEJANDRO DOMINGUEZ-**
**PEREZ and ROSANN TERCERO,**

        **Defendants.**

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on *Defendant Rosann Tercero's Motion to Suppress Evidence Seized at 6615 Lamy N.W., Pursuant to a Search Warrant* [Doc. 64] and *Defendant Rey Alejandro Dominguez-Perez' Motion to Suppress Evidence Seized at 6615 Lamy N.W., Pursuant to a Search Warrant* [Doc. 91].[1]  The Court held hearings on the motions on January 19, 2016 and February 12, 2016.[2]  Having considered the parties' submissions, the record, the relevant law, and being otherwise fully advised in the premises, the Court GRANTS-IN-PART and DENIES-IN-PART Defendants' motions.

This case requires the Court to determine (1) whether the affidavit for search warrant contained false statements that must be excised pursuant to *Franks v. Delaware*,

---

[1] Other than replacing Ms. Tercero's name with Mr. Dominguez-Perez' name, the Defendants' Motions are identical.

[2] Initially, the hearing on January 19, 2016 was scheduled on Ms. Tercero's Motions to Dismiss, and the hearing on February 12, 2016 was scheduled on Mr. Dominguez-Perez' Motions to Dismiss.  However, at the February 12, 2016 all parties agreed that the testimony from both hearings would be considered on both Defendants' Motions to Suppress.  [Tr. 2/12/16, pp. 16-17, 148]  For the February 5, 2016 hearing, the Court is relying on a rough draft of the transcript, and thus minor differences may be present between it and the final draft.

1

438 U.S. 154 (1978); (2) whether the affidavit for search warrant established a sufficient nexus between 6615 Lamy and criminal activity to support probable case; (3) whether the seizure of firearms in the home was lawful; and (4) whether the seizure of cellular telephones and their contents was lawful.

## I.   BACKGROUND

On February 5, 2015, the Drug Enforcement Administration (DEA) obtained a search warrant for 6615 Lamy, N.W., Albuquerque, New Mexico.  This address was the residence of Defendants Rey Alejandro Dominguez-Perez and Rosann Tercero.  The DEA in conjunction with the Albuquerque Police Department had been conducting surveillance on the residence, culminating in a traffic stop of Defendants by New Mexico State Police and search of their house on February 5, 2015.  The affidavit in support of search warrant sets out many pages about the case agent's background and experience in drug investigations.  In support of probable cause to search 6615 Lamy, and pertinent to this motion,[3] the affidavit also sets out the following facts:

---

[3] The Affidavit also described a traffic stop conducted the same day on a different car in which Defendants were traveling.  [Doc. 64-1 ¶¶ 19, 20]  Defendants challenged the lawfulness of the traffic stop and subsequent detention and search by separate motions [Doc. 63; Doc. 90], which the Court has granted.  [Doc. 122]  Accordingly, as discussed further below, all statements made in the affidavit for search warrant relating to the illegal portion of the traffic stop and the evidence pertained therefrom will be excised from the search warrant affidavit for purposes of analysis of the present motion.  *C.f. United States v. Herrera*, 444 F.3d 1238, 1250-51 (10th Cir. 2006) (holding that *Leon's* good faith exception to the exclusionary rule did not apply to officer's mistake as to his authority to conduct a search, rather than third party's mistake); *United States v. Scales*, 903 F.2d 765, 768 (10th Cir. 1990) (declining "to extend the holding of *Leon* to cases in which the good faith of the officer cannot be presumptively established by the existence of a search warrant valid on its face").

2

On February 5, 2015, at approximately 7:40 AM, DEA Special Agent S. Hartz established surveillance in the area of 6615 Lamy Street NW, Albuquerque, New Mexico, the known residence of Dominguez-Perez and Tercero. . . .

At Approximately 7:41 A.M., SA Hartz observed a female, identified as Tercero, exit from the front of the residence and walk to the white Avalanche. Tercero was carrying a small red patterned rolling bag with a handle. Approximately a minute later a male, identified as Dominguez-Perez, exited the residence. The male placed the small red bag in the bed of the Avalanche. SA Hartz then observed the male, move the trash bin to the edge of the street for future pick-up. At approximately 7:44 AM, all three subjects entered the Avalanche and departed from the area of Lamy Street. SA Hartz maintained surveillance on the Avalanche . . .

At approximately 10:00 AM, DEA Group Supervisor E. Chavez and SA J. McKinley collected the abandoned trash left at the curb from the TARGET LOCATION. Located inside the trash were used zip lock bags and clear plastic wrappings which appeared to contain heroin residue. SA Bridgeford conducted a field test kit for heroin on the residue. It tested presumptive positive for heroin. I [Patricia Whelan] know based on my training and experience that drug distributors often discard packaging and other material used to transport large quantities of drugs in favor of smaller packaging materials which would be then used for retail sale.

[Doc. 64-1 ¶¶ 15-16, 21]

Based upon the totality of the facts set forth in the Affidavit, the affiant believed there was "probable cause that evidence of the distribution of heroin, including, but not limited to, controlled substances, proceeds from the distribution of controlled substances, and documentary evidence of such illegal distribution, as further described in Attachment B [would] be found" at 6615 Lamy Street. [Doc. 64-1 ¶ 25] Attachment B, as described more thoroughly in the Court's analysis below, describes the items agents were authorized to search for and seize.

3

A Magistrate Judge approved the warrant.  [Doc. 64-1, p. 1]  It was issued at 5:05 p.m. on February 5, 2015 and executed a few minutes later.  The Court understands that the search uncovered quantities of heroin, methamphetamine, and marijuana as well as cellular telephones, firearms and ammunition.  Defendants now seek suppression of all evidence seized as a result of the search.[4]  [Doc. 64; Doc. 91]

## II.      The *Franks* challenge and the lawfulness of the trash pull

Defendants bring a *Franks* challenge to certain statements in the search warrant affidavit.  Under *Franks*

> [a] search warrant must be voided and the fruits of the search suppressed where a court (1) finds that the affiant knowingly or recklessly included false statements in or omitted material information from an affidavit in support of a search warrant and (2) concludes, after excising such false statements and considering such material omissions, that the corrected affidavit does not support a finding of probable cause.

*United States v. Garcia-Zambrano*, 530 F.3d 1249, 1254 (10th Cir. 2008) (citing *Franks v. Delaware*, 438 U.S. 154 (1978)).[5]  The defendant must establish that the affidavit

---

[4] The Court, in conducting its analysis, does not raise or consider any arguments not made by the parties.

[5] *Franks* also sets forth the burden on the defendant to be entitled to a *Franks* hearing, which is that:  "[T]he challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. . . . Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." *Franks*, 438 U.S. at 171.  The United States argued that the Court should not grant a *Franks* hearing without a stronger showing by Defendants.  [Doc. 66, pp. 5-6]  Applying the Court's discretion, the Court held the evidentiary hearing in this case.  *See United States v. Herrera*, 782 F. 3d 571, 573-74 (10th Cir. 2015) ("[A] defendant has no right to an evidentiary hearing unless he first makes the showing the Supreme Court has prescribed. But from that it doesn't follow that a district court errs when it grants a hearing without such a showing. . . . To the contrary, district courts generally enjoy a fair

contains perjury or a statement made with reckless disregard of the truth by a preponderance of the evidence in order for the statements to be excised.  *Franks*, 438 U.S. at 156.

Defendants assert that the evidence seized as a result of the search must be suppressed because the affidavit for search warrant contains material omissions and false and misleading statements.  Defendants contend that the statements reflecting that SA Hartz observed Mr. Dominguez-Perez pull the trash can to the curb and that the trash can was located at the curb when SA McKinley conducted the trash pull must be excised from the affidavit because they are false and were made in reckless disregard to the truth.[6]  [Doc. 107, pp. 11-12]  By affidavits and the testimony of Ms. Tercero, Defendants claim that the trash can was on the property next to the garage, *not on the street*, at the time of the trash pull.  [Doc. 72-2; Doc. 72-3; Doc. 100, pp. 178-182]

Accordingly, the Court held an evidentiary hearing, which produced both significantly contradicting testimony as well as much debate concerning the content of the photograph taken by SA Hartz which was attached to the affidavit for the search warrant.  [Exhibit 5a]  Defendants argue that a black object at the left edge of the

---

amount of discretion in choosing the procedures they find most helpful for resolving pretrial motions, including whether to take the matter on the briefs, hear oral argument, or hold an evidentiary hearing. And often enough courts will choose to err on the side of granting more process than might be strictly necessary in order to ensure not only that justice is done but that justice is seen to be done.").

[6] Our United States Supreme Court has held that the Fourth Amendment does not prohibit the "warrantless search and seizure of garbage left for collection outside the curtilage of a home."  *California v. Greenwood*, 486 U.S. 35, 37 (1988).  "Curtilage is the area to which extends the intimate activity associated with the sanctity of a ... home and the privacies of life."  *United States v. Long*, 176 F.3d 1304, 1308 (10th Cir. 1999).

photograph is the wheel to the black garbage bin (while the rest of the bin is out of the frame), up near the garage and not down at the street. The United States argues that the black object is the wheel of a go-cart, and the black garbage bin is on the street out of the frame. [Doc. 108, pp. 24-25] Defendants argue that the picture establishes that the Government's witnesses' statements in the search warrant affidavit, which state that the black garbage bin was on the street, were "misrepresentations, omissions and reckless disregard for the truth." [Doc. 107, p. 12] Accordingly, the Court sets out the testimony of the various witnesses who testified to this issue as well as the Court's description of the photographic evidence.

Reynaldo Rodriguez, a Special Agent with the Drug Enforcement Administration (DEA) testified for the United States. [Doc. 100, p. 18] He testified that he took pictures, Exhibits 1, 2, and 3, of 6615 Lamy Street while conducting surveillance on February 2, 2015. [Doc. 100, p. 20] The pictures show the house at 6615 Lamy Street, which faces South. The photographs were taken from somewhere west of the residence and show the residence from an angle making it difficult to determine the exact location of the go-cart. All three pictures show a go-cart in front of the house, and, from the Court's review of the photographs, the go-cart seems more likely to be entirely on the rock landscaping to front of and west of the garage and west of the driveway because it appears that there are rocks and leaves touching the front of the rear left tire (which is on the side closest to the driveway). Exhibit 1 shows two large bins to the west of the garage. These bins are one rolling black garbage bin near the front end of the garage and immediately behind it one blue rolling recycling bin. [Exhibit 1] Exhibit 2 also shows

6

two community mailboxes in front of the sidewalk a few feet west of the western edge of the rock landscaping in front of the property at 6615 Lamy Street.  [Exhibit 2]

SA Rodriguez testified that he interviewed the owner of 6615 Lamy Street, who had let the residence to Defendants, as well as the owner's daughter, on January 20, 2016 (between the first and second days of hearings in this case).  [Tr. 2/12/16, p. 48]  SA Rodriguez testified that these women said that they had not placed restrictions on renters as to where to put the trash bins on the street and that where to put the garbage bin was an issue that had never come up before.  [Tr. 2/12/16, p. 49]  SA Rodriguez testified he did not know whether the Post Office or the local mail carrier advised residents not to block mailboxes.  [Tr. 2/12/16, pp. 53-54]

The United States called DEA Special Agent Scott Michael Hartz who was assigned to conduct surveillance on the residence on February 5, 2015.  [Doc. 100, pp. 27-29]  He testified that about a minute after he arrived to conduct surveillance at 7:40 a.m., he saw "a female," now known to be Defendant Rosann Tercero, exit the house with a child, carrying a suitcase.  [Doc. 100, p. 30]  They went to a Chevy Avalanche in the driveway, leaving the suitcase by the truck.  [Doc. 100, p. 30]  About a minute later, Defendant Rey Alejandro Dominguez-Perez exited the home and placed the suitcase in the bed of the truck.  [Doc. 100, p. 30]  SA Hartz testified that Mr. Dominguez-Perez then walked to the west side of the house and moved the black garbage bin down to the street, leaving the recycling bin on the west side of the house.  [Doc. 100, pp. 31-32]  Looking at Exhibit 1, SA Hartz testified that he took the garbage bin from "the area" where it is depicted in Exhibit 1.  [Doc. 100, p. 31]  Looking at Exhibit 4, which is a print of a

7

picture taken by Google of the residence at 6615 Lamy Street (though the label at the top of the picture states 6611 Lamy St. NW) taken in May of 2015, SA Hartz testified that Mr. Dominguez-Perez took the black garbage bin to the street on the west side of the driveway.  [Doc. 100, pp. 33-35]  Agent Hartz also testified that there was a go-cart near the driveway on February 5, 2015.  [Doc. 100, p. 35]  Agent Hartz testified that the female, male and child then left and he followed them continuing his surveillance.  [Doc. 100, pp. 35-36]  Agent Hartz did not take any photographs while at 6615 Lamy Street before 8:00 a.m. on February 5, 2015.  [Doc. 100, pp. 38-39]  He testified this was because he "was the only person on scene observing what occurred, and I immediately started making phone calls and getting on the radio, trying to get other agents there, and so taking photos was lower on my priority list."  [Doc. 100, pp. 38-39]

SA Hartz returned to 6615 later in the day on February 5, 2015.  [Doc. 100, p. 36] While there the second time he took a photograph, Exhibit 5a.  [Doc. 100, p. 37]  Exhibit 5a shows the residence at 6615 Lamy Street from directly in front of the residence, with a black vehicle parked in the right (East) half of the driveway.  To the west of the garage can be seen half of the blue recycling bin (the other half is out of the frame of the picture), still next to the garage.  Closer to the garage, and either in front of the recycling bin or directly between the bin and the garage are what appear to be boxes.  Not visible in the picture are the front, western edge of the driveway, the mailboxes, or most of the rock landscaping to the west of the driveway.  Also not visible are some or all of either the go-cart or black garbage bin.  All of the shadows in Exhibit 5a appear to fall to the East and North of the objects which create them, suggesting the sun is somewhat in the Eastern

8

and Southern part of the sky.  There is a shadow and a sliver of a blurry black object, most of which is out of the frame, in front of the blue recycling bin.

SA Hartz testified that he believes the blurry black object is "a go-cart."  [Doc. 100, pp. 39-40]  The United States introduced an enlargement of Exhibit 5a, showing only the black object, the lower portion of the blue recycling bin behind it, and what appears to be the left side of the boxes between the bin and the garage as Exhibit 5b. Exhibit 5b is pixelated and blurry, but appears to show a go-cart tire facing the same direction as it was facing in the pictures showing the go-cart taken on February 2, 2015 (Exhibits, 1, 2, and 3).  Looking at Exhibit 5b, SA Hartz testified that "that black object is the go-cart tire backed up with the recycling bin."  [Doc. 100, p. 43]  SA Hartz testified that he took the picture that is Exhibit 5a after the trash pull at issue was already conducted.  [Doc. 100, p. 51]  He was asked to take a photo of the house to attach to the warrant request.  [Doc. 100, p. 51]

DEA SA Jeffrey McKinley testified for the United States as well.  [Doc. 100, p. 58]  He testified that he spoke to SA Hartz by phone, who told him to go to the Lamy house and get the trash that Mr. Dominguez-Perez had taken to the curb.  [Doc. 100, pp. 61, 78-79]  SA McKinley arrived at 6615 Lamy Street around 9:25 am and "saw the City of Albuquerque trash can sitting on the curb."  [Doc. 100, p. 62]  Looking at Exhibit 4, he indicated that he saw the black garbage bin at the street in the area in which the blue recycling bin is shown in Exhibit 4.  [Doc. 100, p. 64]  SA McKinley testified that the normal garbage pick-up day for that area was Friday; February 5, 2015 was a Thursday; and the 6615 Lamy Street garbage bin was the only one in the neighborhood put out to

9

the curb.  [Doc. 100, p. 63]  SA McKinley stated that after his supervisor, Eduardo Chavez, arrived, he pulled his truck up next to the garbage bin, took two or three bags of garbage out of the bin, and put the bags in the back of his truck, without going onto the property at 6615 Lamy Street at all.  [Doc. 100, pp. 62, 66]  SA McKinley testified that he did not remember any vehicles being in front of the house or in the driveway.  [Doc. 100, p. 72]  SA McKinley testified that he took the garbage back to the Albuquerque district office and searched it, finding small wrappings.  [Doc. 100, p. 80]

The United States called Jason Franklin, a detective with the City of Albuquerque, who testified that he was on a task force with the DEA and assisted with the investigation of the Lamy house on February 5, 2015.  [Doc. 100, pp. 195-96]  He testified that the case was SA Whelan's case (SA Whelan was the affiant of the search warrant, though she did not testify at the hearing).  [Doc. 100, p. 197]  He testified that "somebody had called up over the radio that the trash was left outside on the street and that we should possibly do a trash pull."  [Doc. 100, p. 199]  He further testified that, by the time he got back to the house on Lamy Street, the garbage pull had been conducted, and that he sat four houses to the west and monitored the residence for six to seven hours.  [Doc. 100, p. 199]  He further testified that as he sat watching the house he observed that the black garbage bin was out at the curb, in the approximate area of the blue bin depicted in the United States' Exhibit 4, which is to the west of the driveway near the mailboxes.  [Doc. 100, p. 200]  Detective Franklin testified that the search started after the warrant was authorized, and the search began sometime around 5:00 or 5:15.  [Doc. 100, pp. 201-02]  Detective Franklin testified that he assisted with the search of the residence, and doing so he

10

learned that there was a stolen motorcycle in the back yard, which he had towed.  [Doc. 100, pp. 200-01]  According to Detective Franklin:  "When the tow truck company got there, the individual needed help pushing that motorcycle out of the back yard because we couldn't start it, and I had to move the blue trash can out of the gate area that was on this photo just to my left."  [Doc. 100, p. 201]  He testified that he did not have to move the black garbage bin as it was in the street.  [Doc. 100, p. 201]  Finally, he testified that he only remembered the blue recycling bin and a "confined area of a little puppy" being in the area to the west of the garage, thus, he did not recall the presence of a go-cart.  [Doc. 100, pp. 207-08]

Eduardo Chavez was a group supervisor for the DEA at the time of the search of 6615 Lamy Street.  [Tr. 2/12/16, pp. 19-20]  Sergeant Chavez conducted surveillance of 6615 Lamy Street on January 28, 2015 and took six photographs that day.  [Tr. 2/12/16, pp. 22-25, 31; Exhibits 11-15, 17]  All show the driveway area of the residence at 6615 Lamy Street, some with Mr. Dominguez-Perez in them and some without.  Exhibit 17 shows the go-cart, which appears to be in the rock landscaping, and which appears to have a flat left rear tire.  [Exhibit 17]  Exhibit 17 also shows that the rims of the wheels on the go-cart are lighter than the wheels, appearing to be a silver or gray or dirty-white color.  The black garbage bin is seen to the west of the garage protruding approximately a foot beyond the front wall of the garage.  [Exhibit 17]

Sergeant Chavez further testified that on May 5, 2015, SA McKinley contacted him and told him the garbage was out at the curb, and asked if he should pull the garbage.  [Tr. 2/12/16, p. 33]  Sergeant Chavez agreed and testified that he watched SA McKinley

do the garbage pull from the bin that was "pulled up against the curb" to the left of the driveway.  [Tr. 2/12/16, pp. 35-36, 40]  He testified that Agent McKinley "pulled up right next to it, got out, and opened the trash bin, and pulled several bags out into the bed of his truck."  [Tr. 2/12/16, p. 36]  He also testified:

> Agent McKinley is a bit of a germophobe, and I was actually laughing to myself because some of the trash was leaking and it got all over his pants as he was lifting it into the bed of the truck.  So that's one of the things I remember from that day.

[Tr. 2/12/16, p. 36]  Sergeant Chavez testified that he did not take any pictures on February 5, 2015.  [Tr. 2/12/16, p. 38]  While he agreed that it is important to take photographs of what an Agent is observing when doing surveillance, he testified:

> Photographs, when I take surveillance photographs, are of suspects, generally speaking, not to corroborate one of my own agent's activities. I'm there primarily for his safety; and then secondly, there to corroborate with my eyes, so not wanting to take a photograph and lose my periphery vision of anything else that might be going on as he's conducting his activity.

 [Tr. 2/12/16, pp. 36, 40, 43]

Ms. Tercero called Michelle Harris, a producer and forensic audio and video enhancement analyst employed by C & H Productions.[7]  [Tr. 2/12/16, p. 56]  Ms. Harris went to 6615 Lamy Street one year and 5 days after the picture in Exhibit 5a was taken and attempted to recreate the image in Exhibit 5a using only the black and blue garbage bins; no go-cart was present.  [Tr. 2/12/16, pp. 65, 67, 108]  Ms. Harris testified that she took a photograph, Exhibit M, of the house and the garbage bins at 12:48 p.m. on

---

[7] The Court permitted Ms. Harris to testify as an expert regarding what she did with the photographs, and to offer a lay opinion as to her interpretations of the photographs.  [Tr. 2/12/16, p. 78]

February 10, 2016.   [Tr. 2/12/16, pp. 70-71]  She cropped the photograph in an attempt to replicate Exhibit 5a [Exhibit N], enlarged the photograph [Exhibit O], and, using Photoshop software, put a 9 percent blur filter on the photograph [Exhibit P], in an attempt to replicate the blur in Exhibit 5a.  [Tr. 2/12/16, pp. 72-77]  Looking at Exhibit 5a, Ms. Harris testified that she did not believe the black object was the tire of the go-cart because "[y]ou would see additional shadow from the go-cart from the cage that is taller than the trash cans, the steering wheel, and the roll bar from the go cart" as well as the bottom of the go-cart.  [Tr. 2/12/16, p. 74]  Looking at Exhibit 3, Ms. Harris testified that the shadow of the go-cart was taller than that of the garbage bins, and thus she testified that in Exhibit 5a, if the shadow came from the go-cart, we would expect to see more of a shadow.   [Tr. 2/12/16, pp. 80-81]   On cross-examination, however, looking at her photographs or images produced by the United States from her photographs, Ms. Harris agreed that some of the handle of the trash can is visible in the images she produced.  [Tr. 2/12/16, pp. 100-103]

Gary Ainsworth, a private investigator, testified for Ms. Tercero that he interviewed a woman who lived at 6605 Lamy Street (two houses from 6615 Lamy Street) in March of 2015.  [Doc. 100, pp. 149-151; Exhibit F]  The woman he interviewed testified that she checks her mail at the community mailboxes near 6615 Lamy Street between 1:00 and 4:00 p.m.  [Doc. 100, pp. 163-64]  She did not recall seeing any garbage bin at the curb near the mailboxes on February 5, 2015, though she did recall the police activity later in the day while the house was being searched.  [Doc. 100, p. 153]  She told Mr. Ainsworth:  "I go to the mailbox everyday between 1:00 and 4:00 roughly

13

because that's when he comes during those times and I feel like I would have noticed if there had been a can out there at all but I don't remember seeing one." [Doc. 100, p. 158] This witness later told Mr. Ainsworth by email that "I have a brain injury and have very poor memory" and that she had moved. [Doc. 100, p. 161; Doc. 94-1] She did not testify in Court.

Rebecca Zaragoza, Defendant Tercero's mother and Defendant Dominguez-Perez' mother-in-law, also testified. [Doc. 100, pp. 163-64] She testified that she drove by 6615 Lamy Street at exactly 5:00 in the afternoon on February 5, 2015 because Ms. Tercero did not answer her phone all day. [Doc. 100, p. 164-65] She testified that there were unmarked vehicles, "like Tahoes and pickups . . . parked on the driveway, on the side of the gravel, and on the street." [Doc. 100, p. 166] Looking at Exhibit 4, she testified that the garbage bin was not out on the street because "all the vehicles were parked right here.  How can a trash can be outside?" [Doc. 100, p. 166]

Defendant Tercero also testified. [Doc. 100, p. 176] She testified that she was living at 6615 Lamy Street on February 5, 2015. [Doc. 160, p. 176] She testified that the garbage bin was not out on the street when she and her husband and two daughters left the house at 7:45 a.m. "because when I backed up, I should have seen it, but it wasn't there." [Doc. 100, p. 178] Ms. Tercero testified that they always put the garbage bins out on the east side of the driveway, at the street directly in front of the front door (an area clearly visible in all of the images) rather than on the west side of the driveway. [Doc. 100, p. 179] She testified this is because the woman from whom they rented the house would not let them put the garbage bins near the mailboxes because it would block the

14

access of the mailman.  [Doc. 100, p. 179]  She also testified that on February 4, 2015 she put the boxes and big bags outside near the garbage bins and when she did so she "moved the black bin to the side, and there I put that garbage."  [Doc. 100, p. 180]  She testified that the shadow shown in front of the blue bin on Exhibit B (and Exhibit 5a) is the shadow from the black garbage bin.  [Doc. 100, p. 180]  Ms. Tercero testified that the go-cart in the United States' Exhibit 2 was not in front of her house on February 5, 2015 because her cousin, to whom it belonged, took it so it would not get stolen.  [Doc. 100, p. 182]  She also testified that in Exhibit 2 the go-cart was "[h]alf on the driveway and half on the gravel."  [Doc. 100, p. 182]  Ms. Tercero testified that she and her husband would "almost always" put out both the black garbage bin and the blue recycling bin.  [Doc. 100, p. 181]  She also testified that she and her husband would not have taken the garbage bins out to the street because they were going to be out of town and "there was not going to be anyone to bring them back in."  [Doc. 100, p. 181-82]

From the photographs, the Court is left with no strong conviction one way or the other as to the actual location of the black garbage bin on February 5, 2015.  Any of the observations emphasized by either the United States or Defendants may be attributable to the poor picture quality in Exhibit 5a rather than the object size or shape or nature of the shadows.  For example, the lack of the shadows from the roll bars of the go-cart may be more likely attributable to the low resolution of the photograph in 5a as well as the obstruction of the shadows by the black object and the angle of the photograph.  On the other hand, what appears to be a wider tire including a curved front, more consistent with the go-cart's tire than the garbage bin's, could also be the result of the low resolution and

15

the framing of the photograph.  However, the Court's review of the photographs make it seem slightly more likely that the object is the go-cart's wheel and tire because: 1) there is a lighter area in the center of the tire shown in the Government's Exhibits 5b and 5c, more consistent with the wheel of the go-cart, as shown in Exhibit 17, than the wheel of the garbage bin, as shown in Exhibits 3, M-2, M-3, L, M, O, and P; 2) looking at the same exhibits, the shape, apparent width of the tire, and apparently flat shape of the tire appear more consistent with the tire of the go-cart than the garbage bin; and 3) the lack of visibility of any part of the handle of the black garbage bin in Exhibits 5a and 5c, unlike in Exhibits M-1, M-2, N-1, N, P and Q.

The Court does not find that any of the United States' witnesses lacked credibility, or that they made any deliberate false statements or reckless omissions of the truth.  The Court does not find the interview of the neighbor from 6605 Lamy Street to be persuasive.  The Court does not find the testimony of Ms. Zaragoza, Ms. Tercero or Mr. Dominguez-Perez convincing enough to meet their burden of establishing that the affiant (including the officers who informed the affiant) made false statements in order to obtain the search warrant.

*Franks* puts the burden of proving false statements on the Defendant.  *Franks*, 438 U.S. at 156 (stating that the Court must excise statements from a warrant affidavit where "the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence").  Based on the evidence as a whole, the Court determines that Defendants have not met their burden, and, if anything, the evidence weighs ever so slightly more in favor of the United States than Defendants with respect to

16

whether the black image in Exhibit 5a is the go-cart's tire or the garbage bin's tire. The inference from this photograph, therefore, is that the black garbage bin was at the street, i.e., not in the home's curtilage, consistent with the statements in the search warrant affidavit. Accordingly, the Court will not excise the statements in the search warrant affidavit concerning the garbage pull or the evidence found as a result of the garbage pull.

As to the evidence seized from the garbage pull, Defendants argue that there is no nexus connecting the evidence found in the garbage bin to the residence justifying the search of the residence. [Doc. 64, p. 8]

> "Whether a sufficient nexus has been established between a defendant's suspected criminal activity and his residence ... depends [on] the facts of each case." [*United States v.*] *Biglow*, 562 F.3d [1272,] 1279 [(10th Cir. 2009)]. Thus, when reviewing an affidavit in support of a search warrant, we do not require "hard evidence or personal knowledge of illegal activity [to] link a Defendant's suspected unlawful activity to his home." *Id.* (quotation marks and citations omitted). "Instead, we have indicated that a sufficient nexus is established once an affidavit describes circumstances which would warrant a person of reasonable caution in the belief that the articles sought are at a particular place." *Id.* (quotation marks and citations omitted). Thus, "judges may rely on the opinion of law enforcement officers as to where contraband or other evidence may be kept" as well as inferences reasonably drawn from the "evidence connecting a defendant's suspected activity to his residence...." *Id.* at 1279-80 (quotation marks and citation omitted).

*United States v. Timley*, 338 Fed. Appx. 782, 789-90 (10th Cir. 2009) (unpublished decision).

Defendants' argument is not convincing. Here law enforcement agents observed the black garbage bin next to the residence about a week prior to the search; watched the Defendants exit the residence on February 5, 2015; and watched Mr. Dominguez-Perez pull the garbage bin from next to the garage to the street approximately 3 hours before the

17

garbage pull, thus exercising control over the garbage bin as well as connecting the garbage bin on the street to the residence at 6615 Lamy Street. *See id.* at 790 (rejecting argument that there was not a nexus between garbage located "in the alley directly behind the residence" and the residence based on the close proximity and on the fact that mail addressed to the defendant's wife was in one of the garbage bags).

### III.   The search warrant affidavit establishes probable cause to search 6615 Lamy

Given the Court's ruling by separate order on the traffic stop, the Court concludes that the following statements must be excised from the search warrant affidavit, which all pertain to the evidence obtained from the illegal portion of the traffic stop:  paragraph 19, sentences 5-11; all of paragraph 20; all of paragraph 22; all of paragraph 23; and all of paragraph 24.[8]  [Doc. 64-1]  Remaining in the affidavit, however, are paragraphs 15, 16 and 21, relevant portions of which were set out above.  Crucially, these paragraphs which describe the evidence obtained from the garbage pull, including used zip lock bags and clear plastic wrappings which contained heroin residue, and which were consistent with repackaging larger amounts of controlled substances into smaller packages for retail sale. These paragraphs provide the probable cause necessary to search the residence.

### IV.   The seizure of the firearms was unlawful

Defendants argue that the firearms and ammunition were unlawfully seized because the Magistrate Judge crossed out firearms and ammunition on Attachment B to

---

[8] This evidence includes: evidence of a large sum of United States currency; (disputedly) inconsistent statements by the co-Defendants about the amount of currency and how they came into possession of the currency; and the results of a drug sniff on the currency.

18

the search warrant, thus not allowing the officers to seize the firearms.  [Doc. 64, p. 19; Doc. 91, p. 19]  The United States responds that the plain-view doctrine justified seizure of the firearms and ammunition.  [Doc. 66, pp. 18-19]  Defendants reply that:  the warrant was invalid; the Magistrate Judge crossed firearms off and thus "specifically precluded agents from seizing firearms;" and the incriminating character of the firearms was not immediately apparent.  [Doc. 72, p. 10]  The Court notes that there was no testimony or evidence produced at the hearing concerning where and how the firearms were discovered,[9] or what the officers doing the search knew about the Defendants at the time of the search, which hinders the Court's analysis.

"The Government bears the burden of demonstrating the reasonableness of a warrantless seizure."  *Herrera*, 444 F.3d at 1242 (internal quotation marks, ellipses and citation omitted).  The plain-view doctrine allows the "warrantless seizure of evidence of crime in plain view."  *Horton v. California*, 496 U.S. 128, 130 (1990).

> To justify a warrantless seizure based on plain view, three conditions must be satisfied. First, the seizing officer must not have violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. Second, the item must not only be in plain sight, but its incriminating character must also be immediately apparent. Finally, not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself.

*United States v. Naugle*, 997 F.2d 819, 822 (10th Cir. 1993) (internal quotation marks and citations omitted).

---

[9] The United States attached to one of its Responses photographs purportedly showing the firearms and ammunition in the home, however, there was no testimony authenticating the pictures or giving further detail.  [Doc. 97-1]

19

Here, the Court has already concluded that the search warrant was valid and, it thus follows, that the officers did not violate the Fourth Amendment by being in the residence conducting the search.  As to plain sight, despite the lack of testimony or evidence as to the location of the firearms and ammunition and how they were found, because the warrant authorized the officers to search for items smaller than firearms and ammunition, including papers, receipts, notes, money orders, safe deposit keys, precious stones and jewelry, plastic bags, duct tape, and other small items, the Court cannot imagine circumstances in which the authorized search for those small items would nonetheless not expose firearms and ammunition to plain sight.

As to whether the incriminating nature of the firearms was immediately apparent at the time of the seizure of the firearms and ammunition, however, the Court is not persuaded by the United States' argument.  The United States argues that the incriminating nature of the firearms was known to the officers because Mr. Dominguez-Perez is allegedly an alien unlawfully in the United States, and therefore his possession of a firearm violates 18 U.S.C. § 922(g)(5)(A).  [Doc. 66, p. 18]  There was no testimony or evidence in the record, however, that the law enforcement officers conducting the search were aware that Mr. Dominguez-Perez was an alien *unlawfully* in the United States at the time the firearms were seized.  As this is the sole grounds advanced by the United States to support the immediately apparent incriminating nature of the firearms and ammunition, the Court concludes that the United States has failed to meet its burden and that this evidence must be suppressed.

20

Thus, the Court will suppress the evidence of the firearms and ammunition because law enforcement officers unlawfully seized the firearms during the search.

**V.    The search warrant was not particularized as to the search and seizure of the text messages on the cellular telephones**

There are two purposes behind the warrant requirement:

> First, the magistrate's scrutiny is intended to eliminate altogether searches not based on probable cause. The premise here is that any intrusion in the way of search or seizure is an evil, so that no intrusion at all is justified without a careful prior determination of necessity. The second, distinct objective is that those searches deemed necessary should be as limited as possible. Here, the specific evil is the 'general warrant' abhorred by the colonists, and the problem is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings. The warrant accomplishes this second objective by requiring a 'particular description' of the things to be seized.

*Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (citations omitted). "[T]he fourth amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and circumstances allow, and warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized." *United States v. Leary*, 846 F.2d 592, 600 (10th Cir.1988) (internal quotation marks and citation omitted).  The Fourth Amendment "prevents the seizure of one thing under a warrant describing another.  As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *United States v. Janus Indus.*, 48 F.3d 1548, 1553 (10th Cir. 1995).

Defendants challenge the seizure of their cellular telephones from their residence on the grounds that the warrants were not sufficiently particularized with regard to the

21

cellular telephones, or, alternatively, the text messages on the cellular telephones.  [Doc. 64, pp. 13-18; Doc. 91, pp. 13-19]

Attachment B to the search warrant affidavit described the items to be searched and seized.  [Doc. 64-2]  Attachment B states, in pertinent part:

3.  In any medium, including electronic medium, books, records, receipts, bank statements and records, financial statements, insurance records, loan applications and records, wills, real estate records, money drafts, letters of credit, money orders and cashier's checks, safe deposit box keys, records and agreements, and other documents evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining and/or secreting currency equivalents by the SUBJECTS, and other individuals and business entities acting on their behalf;
. . .
5.  Photographs and videos, in any medium, of the SUBJECTS, assets, and/or depicting unlawful controlled substances;
. . .
11.  In any medium, including electronic medium, documents, books and papers reflecting names, addresses and/or telephone numbers pertaining to but not limited to the SUBJECTS listed above;
12.  In any medium, including electronic medium, books, records, receipts, notes, ledgers, invoices, bank records, diaries, purchase records, cash receipts and disbursements journals, inventory records and other records relating to the sales, repackaging, and redistribution of controlled substances;
13.  In any medium, including electronic medium, records, journals, promissory notes, receipts, and other documents reflecting loans and loan repayment by and between any Financial Institution and the SUBJECTS and entities listed above; all of which are fruits, evidence and instruments of crimes against the United States Government;
14.  In any medium, including electronic medium, receipts, records, and documents indicating ownership, association, and utilization of vehicles by the SUBJECTS and others, to include maintenance and improvements to the vehicles;
15.  Computers, computer software, and peripherals used by the SUBJECTS and others.

[Doc. 64-2, pp. 3-4]

22

Defendants are correct that the words "cellular telephone" or any derivatives thereof (such as cell phone, mobile phone, etc.) are not set forth in Attachment B. However, and especially in light of recent precedent, the Court believes that the use of the terms computers and peripherals [Doc. 64-2, ¶ 15], combined with identifying and limiting items such as photographs, receipts, records and other documents "in any medium" and "including electronic medium," particularly described the cellular telephones and the evidence likely to be found on the cellular telephones. *See Riley v. California*, 134 S.Ct. 2473, 2489 (2014) ("The term 'cell phone' is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers."). The Court thus believes that the seizure of the cellular telephones, and the search of their contents in conformity with the limitations set out in Attachment B to the Search Warrant affidavit, was permissible.

Defendants next argue that, even if the Court concludes that the search warrant authorized the search of the cellular telephones, it did not meet the specificity requirement to allow the search of the text messages on the cellular telephones. [Doc. 64, p. 15] With this argument the Court agrees. First, Attachment B's entire reference to items which may contain electronic media is: "15. Computers, computer software, and peripherals used by the SUBJECTS and others." This general description is clearly insufficient under the law of our Tenth Circuit. *United States v. Carey,* 172 F.3d 1268, 1275-76 (10th Cir. 1999) (stating, regarding computerized files, that "law enforcement

23

must . . . only search the [types of documents] specified in a warrant"); *United States v. Riccardi*, 405 F.3d 852, 862-63 (10th Cir. 2005) (holding that the warrant was not sufficiently particularized where it "was not limited to any particular files, or to any particular federal crime. . . . By its terms, the warrant thus permitted the officers to search for anything—from child pornography to tax returns to private correspondence.  It seemed to authorize precisely the kind of wide-ranging exploratory search that the Framers intended to prohibit" (internal quotation marks, citations and brackets omitted)).

> [O]fficers conducting searches (and the magistrates issuing warrants for those searches) cannot simply conduct a sweeping, comprehensive search of a computer's hard drive. Because computers can hold so much information touching on many different areas of a person's life, there is a greater potential for the intermingling of documents and a consequent invasion of privacy when police execute a search for evidence on a computer.  Thus, when officers come across relevant computer files intermingled with irrelevant computer files, they may seal or hold the computer pending approval by a magistrate of the conditions and limitations on a further search of the computer.  Officers must be clear as to what it is they are seeking on the computer and conduct the search in a way that avoids searching files of types not identified in the warrant.

*United States v. Walser*, 275 F.3d 981, 986 (10th Cir. 2001) (internal quotation marks and citations omitted).

However, our Tenth Circuit also looks at language such as that included in paragraph 15 of the search warrant in context.  In *United States v. Brooks*, 427 F.3d 1246, 1252 (10th Cir. 2005):

> The warrant authorized officers to search two computers and a number of disks "for evidence of child pornography," including
>
> "photographs, pictures, computer generated pictures or images, depicting partially nude or nude images of prepubescent males and or females

engaged in sex acts," ... as well as "correspondence, including printed or handwritten letters, electronic text files, emails and instant messages[.]"

The Court reasoned:

> While the warrant does not explicitly instruct officers to look solely for those text files containing child pornography, in context—and certainly in the view of the officers conducting the search—the restrictions placed upon searches for image files also apply to the other types of files. In other words, although the language of the warrant may, on first glance, authorize a broad, unchanneled search through Brooks's document files, as a whole, its language more naturally instructs officers to search those files only for evidence related to child pornography. In this light, the warrant should be— and was—read by officers to implicitly place the same restriction (i.e., to locate child pornography) on the scope of the entire search.

*Id.* Applying this rationale to the facts at hand, here the immediately preceding paragraphs of Attachment B to the search warrant do specify the type of electronic media likely to be found on the computer, or, by extension, cellular telephones. The description includes, for example, "In any medium, including electronic medium, books, records, receipts, notes, ledgers, invoices, bank records, diaries, purchase records, cash receipts and disbursements journals, inventory records and other records relating to the sales, repackaging, and redistribution of controlled substances." [Doc. 64-2, ¶ 12] Additional particularized descriptions include descriptions of documentary evidence, including electronic evidence, of vehicle ownership, financial records, and photographs or videos depicting controlled substances.[10] [Doc. 64-2, ¶¶ 5, 13, 14] Nonetheless, nothing in

---

[10] Alternatively, under *United States v. Otero*, 563 F.3d 1127, 1134-36 (10th Cir. 2009), *Leon's* good faith exception to the warrant requirement would apply to evidence expressly listed in paragraphs 3, 5, 11, 12, 13, and 14 in an electronic medium. *Id.* (holding that the good faith exception to the exclusionary rule applied where a warrant did not closely enough connect the type of electronic media to which the warrant apply, and thus lacked specificity as to the electronic media, the "inspectors . . . had reason to

Attachment B describes text messages, messages, e-mails, correspondence or even communications among the plethora of items, including documents or electronic media, to be seized and searched.  Thus, the search warrant was not sufficiently particularized as to text messages.

The Court's analysis is not complete, however, as the Court must now consider whether the *Leon* good faith exception applies before the Court determines whether evidence in the text messages or the fruits thereof must be suppressed.  By its own terms, *Leon* "assumes, of course, that the officers properly executed the warrant and searched only those places and for those objects that it was reasonable to believe were covered by the warrant."  *United States v. Leon*, 468 U.S. 897, 918 n. 19 (1984); *see also United States v. Potts*, 586 F.3d 823, 832 (10th Cir. 2009) (same); *United States v. Medlin*, 798 F.2d 407, 410 (1986) ("'*Leon* cannot be invoked in the prosecution's favor on such issues as whether . . . certain items not named in the warrant were properly seized.'" (quoting LaFave, "*The Seductive Call of Expediency*": United States v. Leon, *It's Rationale and Ramifications*, 1984 U. Ill. L. Rev. 895, 915–16 (1984))).  Thus, the Court concludes that *Leon* does not apply in this case, as nothing Attachment B indicates that text messages could be searched, and thus a search of the text messages would be plainly outside the scope of the warrant.

The general "rule is that only the improperly seized evidence, not all of the evidence, must be suppressed, unless there was a flagrant disregard for the terms of the

---

believe the warrant was valid" based on the approval of a magistrate and the inspectors searched only for evidence specified in other portions of the warrant).

warrant."  *Medlin*, 798 F.2d at 411.  While there are exceptional circumstances where "flagrant disregard for the limitations of a search warrant," may require the suppression of additional evidence, *id.*, Defendants have not argued or produced evidence of such circumstances here.  Accordingly, the Court suppresses only evidence obtained from text messages and the fruits thereof, as not being particularly described by the warrant and not subject to *Leon's* good faith exception to the exclusionary rule.[11]

## **CONCLUSION**

For the reasons set forth above, the COURT HEREBY GRANTS-IN-PART and DENIES-IN-PART *Defendant Rosann Tercero's Motion to Suppress Evidence Seized at 6615 Lamy N.W., Pursuant to a Search Warrant* [Doc. 64] and *Defendant Rey Alejandro Dominguez-Perez' Motion to Suppress Evidence Seized at 6615 Lamy N.W., Pursuant to a Search Warrant*.  [Doc. 91]  Both Motions are GRANTED as to the suppression of evidence from text messages take from the cellular telephones seized from the residence and the fruits thereof; as well as the firearms and ammunition.  Both Motions are DENIED in all other respects.

**THE COURT HEREBY ORDERS** that the firearms and ammunition and all evidence of text messages take from the cellular telephones seized from the 6615 Lamy Street N.W., Albuquerque, and the fruits thereof, are hereby SUPRESSED.

---

[11] The Court applies the same analysis to forbid application of *Leon* to the seizure of the firearms and ammunition as "firearms and ammunition" were unambiguously crossed off the list of items for which the United States could search.

27

**SO ORDERED** this 15th day of June, 2016 in Albuquerque, New Mexico.


_____
M. CHRISTINA ARMIJO
Chief United States District Judge